The Deitch Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Consolidated Rail Corporation, Intervenor.

Argued November 17, 1982, before Judges ROGERS, WILLIAMS, JR. and CRAIG, sitting as a panel of three.

466

*Stephen A. George, Buchanan, Ingersoll, Rode-wald, Kyle & Buerger,* for petitioner.

*John J. Gallagher,* Assistant Counsel, with him *John B. Wilson,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*Anne E. Treadway,* with her *John A. Daily,* for intervenor-respondent.

OPINION BY JUDGE CRAIG, December 21, 1982:

In this rate-setting case, petitioner, The Deitch Company,[1] protests an order of the Public Utility Commission which, in adopting the decision of an administrative law judge (ALJ), dismissed the petitioner's complaint alleging that new rates proposed by Consolidated Rail Corporation (Conrail) were unjust and unreasonable under Section 1301[2] and unreasonably discriminatory under Section 1304[3] of the Public Utility Code.

### Procedural History

When Conrail took control of the properties of six transferor bankrupt railroads in the Northeast, it

---

[1] Deitch purchases, processes, and sells scrap iron and steel at a 47-acre facility along the Allegheny River in Sharpsburg, Pennsylvania, depends upon rail for more than ninety percent of its shipments, and relies upon Conrail exclusively for rail service. Deitch also processes material for other parties.

[2] 66 Pa. C. S. §1301.

[3] 66 Pa. C. S. §1304.

conducted studies of its ferrous scrap traffic and concluded that, in general, rates charged for short-haul[4] and light-loading[5] traffic neither compensated the railroad adequately for its costs nor justified investment in equipment necessary to continue such service.

Thus, to increase revenues on short-haul, light-loading traffic and decrease them on heavy-loading, long-haul traffic, Conrail sought to restructure its rates by eliminating point-to-point rates[6] in favor of scale rates.[7]

However, according to its brief, Conrail realized that its proposed scale rates would work a hardship on certain short-haul, light-loading shippers. Thus, after developing its restructuring plan but before filing new rates, Conrail initiated negotiations with affected parties in the Northeast, including Deitch and its customers.

Apparently, during these negotiations, Conrail filed tariff supplements on July 8, 1980 and July 25, 1980, meanwhile instructing its tariff publishing agent to prepare adjusted lower point-to-point rates for publication.

In response to the filing of Conrail's July supplements, Deitch filed a complaint with amendments on July 22, July 31, and August 1, 1980, protesting those intrastate scale rates which affected the petitioner's

---

[4] Although the ALJ did not reiterate a definition of the term in the decision, the testimony makes clear that "short-haul" refers to distances under 150 miles.

[5] "Light-loading" refers to scrap under 100,000 pounds per carload.

[6] Point-to-point rates apply from specific origins to specific destinations.

[7] Unlike point-to-point rates, scale rates apply to various weights of ferrous scrap according to blocks of miles between origin and destination points.

shipments between Sharpsburg and six locations in western Pennsylvania. As a result, the PUC suspended Conrail's proposed intrastate scale rates across western Pennsylvania on August 4, 1980.

Meanwhile, Conrail petitioned the PUC to modify its August 4, 1980 order, and, on November 6, 1980, the commission did so, allowing the railroad's proposed filed intrastate scale rates in western Pennsylvania to become effective, except for the specific filed rates protested by Deitch.

Learning of Deitch's complaint, Conrail also instructed its tariff publishing agent not to file the adjustments, referred to in the record as "rates held in abeyance" (abeyance rates), and chose instead to await the outcome of the PUC proceedings.[8]

The following order of May 8, 1981, adopting verbatim the ALJ's Recommended Order of January 23, 1981 and denying Deitch's exceptions thereto, represents the final PUC outcome:

IT IS ORDERED:

1. That the complaint of The Deitch Company at Docket No. C-80072098 be and is hereby dismissed.

2. The Order at Docket Nos. R-80071275 and C-80072098, adopted August 4, 1980, and the subsequent Order adopted November 6, 1980, at the above-captioned docket numbers are hereby rescinded; the suspended tariffs of Respondent in the above-captioned proceeding are hereby reinstated as of the date of the entry of this Order.

---

[8] In its brief, Conrail contends that it had no alternative but to delay publication of the abeyance rates, because the PUC had already suspended the supplemental tariffs containing Conrail's higher scale rates.

3. The investigation in the above-captioned matters is hereby concluded and the record therein is marked closed.

As a reading of the record makes clear, this May 8, 1981 order (despite Conrail's apparent willingness to apply the abeyance rates to Deitch) made Deitch subject to the *scale* rates which Conrail had filed previously and which, by order of November 6, 1980, the PUC had made effective as to all other shippers in western Pennsylvania, except the petitioner.

For the reasons below, we vacate that portion of the commission's order which makes Deitch subject to the filed scale rates, leaving intact that portion of the order which subjects other non-protesting shippers to the filed scale tariff schedules.

### Review of ALJ's Decision

Section 1302 of The Public Utility Code provides that "[u]nder such regulations as the commission may prescribe, every public utility *shall file* with the commission . . . tariffs showing all rates . . . to be collected or enforced, within the jurisdiction of the commission." (Emphasis added.) Title 52 of the Pennsylvania Code, section .21.1 *et seq.* in turn provides a precise and exclusive method for filing and appealing new and supplemental carrier tariffs.

Our decision to vacate is based on the point that the ALJ's findings of fact and conclusions of law seemingly are not confined to rate schedules actually filed with the PUC, as mandated by section 1302.

As the record in this case reveals, and as the respondents admitted in their briefs and at oral argument, Conrail had not then published or filed its *abeyance* rates with the PUC, but nevertheless submitted to the ALJ revenue-variable cost ratios based

upon such rates, as well as ratios based upon its published-but-suspended *scale* rates.

As his summary of each party's presentation of evidence makes clear, the ALJ, in turn, considered ratios based upon Conrail's then-current less remunerative rates and suspended-but-filed scale rates:

13. Based upon the variable costs per carload of shipments to and from the Deitch Company facilities at Sharpsburg and Brackenridge, Munhall, Homestead, Hays, Bessemer and Pittsburgh (South Side), the weighted average of the ratio of revenue to variable costs on a per car basis, as claimed by respondents, varies from a high of 1.83 (Brackenridge to Sharpsburg) to a low of 1.13 (Munhall to Sharpsburg).

14. Based upon a reduction in per car costs claimed to be $25.75, Deitch computes revenue to variable ratios ranging from a high of 2.05 (Brackenridge to Sharpsburg) to a low of 1.24 (Munhall to Sharpsburg). On the basis of the proposed rates filed with the Commission, Deitch claims these ratios to range from a high of 3.2 (Sharpsburg to Brackenridge) to a low of 1.56 (Sharpsburg to Homestead). Overall, complainant claims that at current rates the ratio of revenue to variable cost to be 1.58 and at proposed rates the ratio to be 2.18.

Further, in his findings, the ALJ referred in general terms to Conrail's "proposed" rates and (1) observed that "the rates proposed by respondents are based upon studies conducted by it tending to show that the least remunerative hauls are those, in general, that are less than 100,000 lbs. per car and for hauls less than 150 miles . . .," (2) noted that Conrail

would probably not invest in needed gondolas if the ratio of revenue to variable cost on a per car basis was less than 140%, and, as noted above, (3) described, but did not make actual findings as to the various revenue to variable cost ratios presented by both parties.

The discussion portion of the ALJ's opinion and the testimony upon which he relied, however, indicates that he did not base his conclusion merely upon ratios supporting the filed tariffs, but instead permitted evidence supporting the unfiled abeyance rates to affect the ultimate recommendation to the commission that Conrail's filed rates be approved.

In his discussion, the ALJ concluded in part that Conrail had met its burden by demonstrating (1) that relevant then-current ratios were noncompensatory, (2) that, in Conrail's opinion, its "proposed" rates would correct that situation, (3) that Conrail, as a non-fixed utility, had no duty to show a rate of return on overall investment that would enable it to purchase or attract investment capital, and (4) that because it demonstrated how it arrived at the "proposed" rates and the data upon which it relied, Conrail had met its burden of going forward with the evidence, evidence which, in the ALJ's opinion, Deitch failed to rebut.

First, we note that, in his findings of fact, the ALJ apparently used the word "proposed" to refer both to Conrail's filed scale rates and unfiled abeyance rates,[9] reflecting the confusion which beclouds this case.

---

[9] Findings of Fact 7 and 8 read as follows:

7. The rates for scrap iron shipments, filed by respondents, but under suspension by order of the Commission, are intended to eliminate point to point tariffs and to establish scale tariff rates for all scrap iron shipments under consideration as follows:

472

More importantly, in finding that Conrail had met its burden of proof, the ALJ stated that "[t]he manner in which they [respondents] arrived at their proposed rates is fully explained by the prepared testimony of [Conrail's Manager of Recyclable Material] Alan L. Peters. . . ." Mr. Peters' verified statement, however, not only makes reference to rates actually filed but to Conrail's unpublished abeyance rates.

Indeed, in its February 9, 1981 reply to the exceptions filed by Deitch before the commission, Conrail admitted "[t]he different variable cost ratios [submitted at the hearing] principally resulted from the fact that Deitch used . . . rates actually filed, *while Conrail employed rates that had been proposed but not filed* because of the pendency of this litigation." (Emphasis added.)

Thus, it is clear that the ALJ's decision was based on evidence not strictly pertinent to this record, because that evidence supported the establishment of abeyance rates which Conrail had not then filed with the commission.

### Subsequent Events

In its brief, Conrail states that, after the ALJ's decision of January 23, 1981 but before the commis-

| Minimum Weight | Eff. 8-7-80 Proposed |
|---|---|
| 60,000 | 16.28 |
| 89,600 | 12.23 |
| 112,000 | 10.59 |
| 134,400 | 9.55 |

8. The elimination of the point to point rates would require complainant to ship at the more costly scale rate tariff. However, Conrail intends to mitigate the severity of the increase by filing a point to point tariff for minimum rates in excess of 100,000 lbs. These *proposed* rates are not intended to be filed prior to the decision of the Commission in these proceedings. (Emphasis added to Finding of Fact No. 8.)

sion order of May 8, 1981, the abeyance rates were put into effect on March 7, 1981 in Tariff PA PUC TEA 4949, Item 1833, Supp. 354; Item 1874; Supp. 324. Because our holding today necessarily supersedes any PUC rate-making action taken after the date of the ALJ's recommended order, as that action affects Deitch, we will suspend the abeyance rates put into effect by the commission on March 7, 1981. Assuming that Conrail duly filed tariff schedules to support such abeyance rates with the commission and assuming that the commission did not hold a hearing on the matter, we remand this case for a hearing to determine if, as applied to Deitch, such abeyance rates are just, reasonable and nondiscriminatory. Until the commission makes that determination, Deitch shall be subject to the rates that were in effect before May 27, 1981, the effective date of entry of the commission's May 8, 1981 order.

ORDER

Now, December 21, 1982, we vacate the order of the Public Utility Commission adopted on May 8, 1981 and entered on May 27, 1981 as that order affects the shipping rates of The Deitch Company and remand this case for a hearing consistent with this opinion.